COX BROTHERS LUMBER COMPANY *v.* JONES.

4-9762                                   248 S. W. 2d 91

Opinion delivered April 28, 1952.

*Wright, Harrison, Lindsey & Upton,* for appellant.

*Graves & Graves,* for appellee.

ED. F. MCFADDIN, Justice. Appellee sought to recover, under the Workmen's Compensation Law, for the death of her husband, Andrew Jones, who was an employee of the appellant, Cox Brothers Lumber Company, and who was struck by a train and killed on the night of May 23, 1949. The Workmen's Compensation Commission denied recovery; the Circuit Court reversed the Commission; and the cause is here on appeal.

The deceased, Andrew Jones, a Negro, was the night watchman at the mill of Cox Brothers Lumber Company (hereinafter called "Cox Brothers"), located near Homan, in Miller County. Jones went to work about six o'clock each night, and worked ten hours. U. S. Highway 67 runs east and west[1] through Homan. The main line of the Missouri Pacific Railroad is immediately south of Highway 67, and Cox Brothers' mill is immediately south of the railroad tracks. The store of William Day is immediately north of Highway 67 and faces south. The home of Mr. and Mrs. Day is west of the store, and also faces south, and is directly north of the Cox Brothers' mill.

Andrew Jones lived in Fulton, about eight miles east of Homan. It was his practice to ride the 5:00 p. m. bus from Fulton to Homan, get off at the Day store, buy a soft drink, and then cross the highway and railroad tracks to the Cox Brothers' mill. He would come to the Day store about 7:00 p. m. in order to purchase his lunch, and then return to the Cox Brothers' mill. On May 23rd, Andrew Jones arrived at the Day store on the 5:00 o'clock bus, purchased a soft drink, stayed around the store about twenty minutes, and went to the mill. The

---

[1] While the course is not precisely East and West, nevertheless those designations are sufficient for purposes of this opinion.

evidence shows that Andrew Jones had been drinking liquor that day. Between 6:30 and 7:00 p. m., he returned to the Day store and purchased some crackers, and salmon or sardines, for his lunch. About 8:00 p. m., after the store was closed, Andrew Jones went to the home of Mr. and Mrs. Day, for some bread, which Mrs. Day gave him. At 8:15 p. m., a trainman from a Missouri Pacific freight train, came to the Day home, and stated that the train had struck and killed a Negro, who was identified as Andrew Jones.

The Commission disallowed recovery, on the theory that Andrew Jones' death was due solely to intoxication, as to which the evidence will be discussed in Topic II, *infra*.

I. *Deviation from Work.* Andrew Jones' journey from the Cox Brothers' mill across the railroad track to Day's store, and his partial return to the place of his employment, did not constitute such a deviation from work as to take him out of the course of his employment. Kenneth Cox, one of the owners of Cox Brothers' mill, testified that they had no objection to Andrew crossing the tracks for anything he needed. It was shown that on several occasions, when the well was broken at the mill, Andrew was obliged to go to the home of Mr. and Mrs. Day for drinking water. He was paid for the time in which he ate his meal; and because of the level terrain he could see the mill from the store. So, the fact that Andrew left the mill and went to the Day home, did not constitute sufficient deviation to take him out of his work. In *Tinsman Mfg. Co.* v. *Sparks*, 211 Ark. 554, 201 S. W. 2d 573, authorities are collected on this point.

II. *Intoxication.* The Commission refused compensation in this case because it found that Andrew Jones' death was brought about solely by his intoxication. The Commission's findings read as follows:

"The Commission, upon full consideration of the evidence, is of the opinion that the death of Andrew Jones was not brought about simply by the act of leaving the mill and going to the store of Mr. Day, which was imme-

diately across the highway, for the purpose of securing something to eat, which was necessary for the sustaining of life, but was, in fact, brought about solely by his intoxication. We are of the opinion that had the decedent not been intoxicated, as the evidence shows that he undoubtedly was, he would not have been injured at the time and at the place and under the circumstances that this injury occurred, and that his accidental death on May 23, 1949, did not, therefore, arise out of and in the course of his employment with the respondent employer.''

Section 5 of Act 319 of 1939, (the original Workmen's Compensation Law) concerns intoxication, and is found in § 81-1305, Ark. Stats., 1947. Section 5 of the amended Workmen's Compensation Law (Act 4, adopted by the people as an initiated measure in the election of 1948) also concerns intoxication; and may be found in § 81-1305 of the Cumulative Pocket Supplement of Ark. Stats. For all purposes here involved, there is no practical difference between the original § 5 and the new § 5. The latter is governing in this case, and provides that the Workmen's Compensation Law covers every employee whose death or injury arises out of, or in the course of his employment, ''. . . provided that there shall be no liability for compensation under this Act where the injury or death from injury was solely occasioned by intoxication of the injured employee. . . .'' Also, in § 24 of the said 1948 Initiated Measure (now found in § 81-1324 of the Cumulative Pocket Supplement of Ark. Stats.), there is contained the same presumption found in § 24 of the original act. The 1948 Act reads:

''In any proceeding for the enforcement of a claim for compensation, the following *prima facie* presumptions shall exist: . . . (4) That the injury did not result from intoxication of the injured employee while on duty. . . .''

In the case of *Elm Springs Canning Co.* v. *Sullins*, 207 Ark. 257, 180 S. W. 2d 113, in considering this matter of intoxication in the light of the presumption against it we said:

"As indicated, § 24 of the Act makes a *prima facie* presumption against the injury resulting from intoxication. The burden is clearly upon appellant* to show, by the testimony, that Sullins' death resulted solely from his intoxicated condition. . . ." "The rule, where the defense of intoxication is used is stated in 71 C. J., p. 770, § 483, as follows: 'Under a statute requiring compensation, except when the injury results solely from the intoxication of the injured employee while on duty, if intoxication of the employee is relied on as a defense, it must be made to appear that the accident which resulted in the injury for which compensation is sought was caused solely and exclusively by the intoxication of the employee.' We think the word 'solely' (as used in § 5 of the Act, *supra,* means exclusive of all other causes. Webster defines 'solely': 'exclusively; to the exclusion of other purposes; entirely; wholly,' . . ." [2]

We thus state, as axiomatic, that under our Workmen's Compensation Law, if the employer seeks to defeat recovery because of intoxication of the employee, the employer must not only prove that the employee was intoxicated, but the employer must go further, and prove that the death of the employee *"was solely occasioned by intoxication."* With this as the standard of the law by which to measure the evidence, we turn now to the evidence in the case at bar. There were only four witnesses in the entire hearing:

(1) Sarah Jones, the widow of the deceased, saw him at 4:30 in the afternoon, and said he was not drunk at that time.

---

* The employer was the *appellant* in the Elm Springs case.

[2] In Schneider's Workmen's Compensation. Text, Permanent Edition, Volume 6, Sec. 1586, it is stated:

"In the States of Arkansas, Kansas, Maryland, New York, Rhode Island, and the Longshoremen's Harbor Worker's Act, the employee's intoxication must be the sole cause of his injuries to bar a recovery of compensation."

Then in § 1589 of the same work, there is discussed:

"Intoxication As Sole Cause of Injury." Our own case of *Elm Springs Canning Co.* v. *Sullins, supra,* is there quoted at length. Also, there is an Annotation in 43 A. L. R. 421, on the subject: "Workmen's Compensation: Effect of Employee's Intoxication." Another Arkansas case involving intoxication, is *Marks* v. *Moore,* 209 Ark. 410, 190 S. W. 2d 524.

(2)   Kenneth Cox, one of the owners of the Cox Brothers' mill, testified that he saw Andrew Jones sometime after 5:00 p. m. on May 23rd, and he was not drunk at that time. Mr. Cox testified that Andrew drank on occasions, but that when he was drunk, he did not report for work.

(3)   Mr. William Day, who operates the Day store just north of U. S. Highway 67, at Homan, testified that he saw Andrew (a) about 5:30 p. m., when he got off the bus; (b) again about 6:30 or 7:00, when he came to the store to purcha'se his supper; and (c) again about 8:00 p. m., when Andrew came to the Day home (next to the store) and Mrs. Day gave him some bread and cake. Mr. Day testified that within fifteen minutes of the last visit, the trainman reported Andrew had been killed by being struck by a freight train. Andrew's head had been hit by some part of the train. Mr. Day said Andrew was drunk on the three occasions that he saw him. Of Andrew's condition at the time of the 8:00 o'clock visit, Mr. Day testified:

"Q. He had been drinking? A. Yes,. sir. Q. But he was not down? He was getting along all right? A. No, sir, he wasn't down. I never saw him get down. He was a fellow who could keep on drinking and not get down. Q.   Would you say he had his senses? A. Oh, yes, he had his senses. He knew what he was doing."

(4)   Mrs. William Day was the fourth and last witness. She testified that she saw Andrew when he purchased his supper at the store, and of his condition at that time, she testified:

"Q.   Mrs. Day, the question was raised in this case that he was drunk. Do you know whether or not he was drunk? A. Well, he was drinking. Q. You say he was drinking? A. Yes, sir. Q. Was he drinking, was he drunk or just drinking? A. He wasn't so drunk he didn't know what he was doing. He came on in the store and bought his supper. Q. Did he stagger any? A. I never did see the Negro stagger. I have seen him drinking quite a lot but I never did see him where he would stagger; and he

could tend to business. He seemed to know. Q. You say he could tend to business? A. Yes. Q. Did he handle himself, was it apparent when he was walking? A. Apparently you wouldn't know he was drinking unless you got right up to him. He was that type that didn't seem to ever get down."

Then Mrs. Day testified that she again saw Andrew at about 8:00 p. m., when he came up to her house and she gave him some bread and cake. As to his condition at that time, she testified:

". . . just a few minutes after eight o'clock, I was sitting on the porch and I noticed someone coming in the gate and he hollered and said, 'This is Andy' and when he got up there I asked him what he wanted and he said he didn't have quite enough bread for lunch and, 'Do you have any cold bread or crackers?' and I said 'Andy, I have always got something for you' and I have fed him any number of times because he has done jobs for us frequently; and I went in and got half a loaf of bread and a little cake; and it was just after eight because the bus just passed; and he thanked me for it and said, 'You go on to bed and I will watch.' He always said if he caught anyone prowling around he would let us know and he said, 'If you hear me tonight, don't be frightened because a cloud came up last night and I got awful scared and if another one frightens me tonight I am going to come over and get on the porch'; and I went on and went to bed and it couldn't have been but ten minutes until the man knocked on the door and said he had killed a Negro."

The foregoing is a review of the testimony, which shows that Andrew left the Day home a little after 8:00 p. m., and that a direct course would carry him across the U. S. Highway 67 and the railroad tracks to the Cox Brothers' mill. It shows that in less than fifteen minutes, the trainman came to the Day home and reported Andrew to be dead. As to all that happened, in the ten or fifteen minutes from the time Andrew left the Day home and started back across the highway and railroad tracks to the Cox mill and the time he was hit by the

train, we will never know. He could have been struck by a truck on the highway and then hit by the train while crawling back to the mill; he could have been assaulted by a highwayman or by a trespasser on the right-of-way of the railroad, and left near the rails; he could have fallen and injured his leg, just as he started on the railroad right-of-way; he could have become so intoxicated that he could not walk, and could have staggered and fallen near the railroad tracks. We are left entirely to speculation and conjecture as to what happened that caused him to be hit by the train. In Horovitz, on Workmen's Compensation Laws (page 133) there is this classic statement:

"*Unexplained deaths* have made Sherlock Holmeses of many judges. The distinction between 'reasonable inferences' (compensable) and speculation, conjecture and surmise (non-compensable) would certainly and often baffle Watson's credulity."

But the Arkansas Workmen's Compensation Law provides a standard to take the place of speculation, conjecture and surmise. Our law says there is a presumption against intoxication causing death; and our law imposes upon the employer the duty—if it would win exemption from paying compensation—of proving that the employee's death "was solely occasioned by intoxication." The employer has failed to discharge that duty in this case. There is no evidence in the record to support the Commission's findings that Andrew Jones' death "was solely occasioned by intoxication."

Therefore, we hold (1) that the Commission was in error in failing to make an award to Sarah Jones; and (2) that the Circuit Court was correct in reversing the Commission and in remanding the cause to the Workmen's Compensation Commission, with directions that it make an award to Sarah Jones. The judgment of the Circuit Court is affirmed.

Mr. Justice GEORGE ROSE SMITH dissents.